**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ AUG 2 3 2012 ★

**LONG ISLAND OFFICE**

————————————————————————X

GEORGE GOUVATSOS,

                Petitioner,

    -against-

ROBERT ERCOLE, Superintendent,

                Respondent.

————————————————————————X

**OPINION & ORDER**
09-CV-1449 (SJF)

FEUERSTEIN, J.

On December 21, 2004, a judgment of conviction was entered against petitioner George Gouvatsos ("petitioner") in the Supreme Court of the State of New York, County of Queens (Roman, J.), upon a jury verdict finding him guilty of two (2) counts of conspiracy in the second degree (N.Y. Penal Law § 105.15) and three (3) counts of criminal solicitation in the second degree (N.Y. Penal Law § 100.10), and imposition of sentence. On April 3, 2009, petitioner filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the petition is denied.

I.    Background

    A.    Factual Background

        1.    The People's Case

Teoginis Familia ("Familia"), petitioner's wife, (T. 780), testified that in September 2002, she and petitioner had been separated for fifteen (15) months, but were not divorced and were still living together; she was dating another man, Henry Ruiz ("Ruiz"); and petitioner was "remarried"

to another woman. (T. 782-84). On September 30, 2002, after playing Familia a tape recording of a conversation between herself and Ruiz, petitioner struck Familia in the head, shoulders, breast, and right hand with a hammer ("the attack"). (T. 784-85). As a result of the attack, Familia received five hundred (500) stitches to the back of her head and fractured her right thumb, (T. 785), and petitioner was arrested and charged with attempted murder in the second degree, two (2) counts of assault in the first degree, assault in the second degree, aggravated criminal contempt, three (3) counts of criminal contempt in the first degree, criminal contempt in the second degree, assault in the third degree and two (2) counts of criminal possession of a weapon in the fourth degree. Thus, at all relevant times, Familia was a witness in a pending criminal proceeding against petitioner arising from the attack.[1] (T. 784).

While awaiting trial on the criminal charges arising from the attack, petitioner was incarcerated at Riker's Island, where Robert Lance ("Lance") was also incarcerated awaiting trial on grand larceny and promoting prostitution charges. (Lance: T. 567, 569, 665, 691-692). Lance testified that on November 15, 2002, petitioner asked him if he knew someone who would murder

---

[1] On October 28, 2003, a judgment of conviction was entered against petitioner in the Supreme Court of the State of New York, Queens County (Erlbaum, J.), upon a jury verdict finding him guilty of the criminal charges against him arising from the attack and imposition of sentence. On May 15, 2007, the New York State Supreme Court, Appellate Division, Second Judicial Department ("Appellate Division") affirmed the judgment of conviction. People v. Gouvatsos, 40 A.D.3d 879, 837 N.Y.S.2d 174 (2d Dept. 2007). On August 22, 2007, the New York State Court of Appeals denied petitioner leave to appeal the order of the Appellate Division. People v. Gouvatsos, 9 N.Y.3d 876, 842 N.Y.S.2d 788, 874 N.E.2d 755 (2007). By order dated September 24, 2007, the trial court (Erlbaum, J.) denied petitioner's motion to vacate his judgment of conviction pursuant to New York Criminal Procedure Law § 440.10. People v. Gouvatsos, No. 3758/2002 (N.Y. Sup. Ct. Sept. 25, 2007). On January 7, 2008, the Appellate Division (Florio, J.) denied petitioner leave to appeal the order denying his 440.10 motion to the New York State Court of Appeals. People v. Gouvatsos, No. 2007-10319 (2nd Dept. Jan. 7, 2008). By order dated December 13, 2010, this Court denied petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his October 18, 2003 judgment of conviction.

his wife, (T. 568-69, 573), and he told petitioner that he would look into it and let him know. (T. 568-69). According to Lance, approximately one (1) week later, he told petitioner that he had found someone who might be interested in murdering Familia for him. (T. 569-570).

Lance testified that he spoke with petitioner every day throughout the following month and that petitioner also requested that Ruiz and Familia's sister, Janet Familia ("Janet"), be killed; that Familia be killed on her way to pick up their son from school; and that Familia and Ruiz be "chopped up." (T. 570-75, 584, 700-01). According to Lance, petitioner told him that he would pay between two thousand five hundred dollars ($2,500.00) to three thousand dollars ($3,000.00) for each person killed. (T. 582-84, 739-740).

Lance testified that in mid-November 2002, he reported his conversations with petitioner to Detective Peter Potapchuck ("Potapchuck"), who worked on Riker's Island, (T. 581-82, 700), and offered to assist in an investigation of petitioner in exchange for receiving some benefit in his own criminal prosecution from the police department and district attorney's office.[2] (T. 692, 741-42 744, 756-58).

On December 17, 2002, after a detective attached a recording device to him, Lance had a ninety (90) minute conversation with petitioner, during which, *inter alia*, they discussed the open criminal proceeding against petitioner and a plan to have Familia murdered for money. (Lance: T.

---

[2]      On January 23, 2003, Lance entered into a plea agreement with the district attorney's office pursuant to which he was permitted to plead guilty to a misdemeanor with respect to the criminal charges then-pending against him and promised a sentence of "time served" in exchange for his truthful testimony in the criminal proceedings against petitioner. (T. 744-45; Lance: T. 665-66, 693-94, 725-26, 749-56; People's Exhibit 19). Following his plea allocution, Lance was released from custody, (Lance: T. 726, 745), but he had not yet been sentenced upon his conviction at the time of petitioner's criminal trial.

647-49, 708-09, 719, 730-31). A recording of that conversation was introduced into evidence at trial, (People's Exhibit 11; T. 649-651), and Familia testified that she recognized one (1) of the voices on that recording as being petitioner's. (T. 796-97).

Detective James MacDonald ("MacDonald") of the Queens County District Attorney's Office, testified that in the course of investigating a planned murder-for-hire involving Familia, he received a telephone message on December 20, 2002 indicating that Lance had called and said that a photograph of Familia would be left in the mailbox at petitioner's daughter's residence in Queens. (T. 471-72, 538-41). Lance testified that he told MacDonald "several times" that petitioner had told him that information about Familia would be left in a mailbox. (T. 713-14). MacDonald went to the address of the mailbox provided by Lance, but there was no photograph at that location. (MacDonald: T. 472, 539).

On December 23, 2002, MacDonald went to Riker's Island and attached a recording device to Lance. (MacDonald: T. 450-55; Lance: T. 651-52). After returning to the prison block to converse with petitioner, Lance called MacDonald, told petitioner that the person he called was an intended hit man and put petitioner on the phone with MacDonald. (MacDonald: T. 455-56, 460-62, 487-88; Lance: T. 653-54, 703-06, 713). After identifying himself to MacDonald as "George," petitioner and MacDonald discussed what proof petitioner wanted as to the successful murder of Familia, by what method petitioner wanted Familia killed and what, if anything, petitioner wanted said to Familia before she was killed. (MacDonald: T. 461-462; Lance: T. 654). According to MacDonald, petitioner said that he wanted Familia to be "chopped up" and that the only proof of Familia's murder that he needed was Lance's word that the "hit" had actually been carried out. (T. 462). MacDonald testified that he did not record his telephone conversation with petitioner

4

because he had not been expecting Lance to call him. (T. 462-63). Recordings of Lance's other conversations with petitioner on December 23, 2002 were admitted into evidence, (Lance: T. 656-57; People's Exhibits 12 and 13), and Familia testified that she recognized one (1) of the voices on those recordings as being petitioner's. (T. 797-98).

Lance testified that sometime later in December 2002, petitioner wrote his daughter's name and address and a location where his daughter would leave photographs of Familia and other information on a piece of paper and gave it to Lance with instructions to give it to the intended hit man. (T. 611-15, 659-660; People's Exhibit 5). Lance had also written on that paper: "Open the gate. Mailbox on the left side," as instructed by petitioner. (T. 611-15, 659-60; People's Exhibit 5). Familia testified that she recognized the handwriting of the name and address of petitioner's daughter as being petitioner's. (T. 792-94). For reasons unknown, the photographs and other materials were never put into the mailbox as planned. (Lance: T. 613-14; MacDonald: T. 547).

Petitioner subsequently told Lance that the photograph of Familia and other information would be left in the sun visor of his daughter's car, gave Lance a piece of paper on which he had written his daughter's name and telephone number and instructed Lance to give the information to the intended hit man for the purpose of obtaining a photograph of Familia. (T. 614, 618-619; People's Exhibit 7). Lance testified that on January 3, 2003, he called MacDonald and told him that petitioner had told him that his daughter was going to leave a photograph of Familia in the sun visor of her unlocked car and that he would let him know what time to go retrieve the photograph, (T. 658, 711), and relayed the information regarding petitioner's daughter's address and car that had been provided to him by petitioner. (T. 660, 711-12).

Detective Fernando Velez ("Velez") testified that on January 3, 2003, after Potapchuck received a telephone call, he and Potapchuck went in an unmarked car to the address petitioner had identified as his daughter's home, (T. 758-762, 773-75), where he observed a vehicle that matched the description of petitioner's daughter's car that had been provided by petitioner. (T. 762). Velez entered the vehicle and retrieved an envelope containing a photograph of Familia and a piece of napkin or paper towel on which Ruiz's telephone number and Familia's work and home telephone numbers were written from the sun visor. (People's Exhibit 17; Velez: T. 761-71, 774-76; Familia: T. 802-3).

On January 8, 2003, Lance again called MacDonald, told petitioner that he was the intended hit man and put petitioner on the phone with MacDonald. (MacDonald: T. 465-466, 470; Lance: T. 660-61, 703-06, 713). During the ensuing conversation, which was recorded and introduced into evidence at trial, *inter alia*, MacDonald complained about the length of time it had taken to receive the photograph of Familia; petitioner told MacDonald that he wanted him to kill Familia, Ruiz, and Janet; and they discussed picking up "something" on the following Friday. (MacDonald: T. 468-471; People's Exhibit 14). Familia testified that she recognized one (1) of the voices on that recording as being petitioner's. (T. 798). MacDonald testified that the "something" to which he and petitioner referred was a two thousand five hundred dollar ($2,500.00) "down payment" for the murders of Familia and Ruiz. (T. 472-73).

Several other recorded telephone conversations between petitioner and MacDonald were also introduced at trial. (People's Exhibits 15, 16, 18). During one of those conversations, on January 9, 2003, MacDonald, as the intended "hit man," and petitioner discussed MacDonald meeting petitioner's brother to retrieve the "down payment" "to follow out on the homicide."

(People's Exhibit 15; MacDonald: T. 474-79; Lance: T. 662-63, 703-06, 713). During another conversation, on January 10, 2003, MacDonald indicated that he had received the photograph of Familia on January 7, 2003. (Exhibit 16; MacDonald: T. 481-83; Lance: T. 663-64). Familia testified that she recognized one (1) of the voices on the recordings of the January 9, 2003 and January 10, 2003 conversations as being petitioner's. (T. 799-800).

Lance testified that although he had discussed payment with petitioner on several occasions, he never received any money from him because petitioner had to rely on people outside of the prison to get it for him. (T. 715-21, 738-40). According to Lance, at no time did petitioner ever indicate that he no longer wanted the murders to be carried out. (T. 741).

The following documents were also introduced into evidence at trial:

(1)    A diagram showing how to get to Familia's house, (Lance: T. 576, 592-95; Familia: T. 788; People's Exhibit 1), which, according to Lance, petitioner drew for the intended hit man. (Lance: T. 576, 592-95). Familia testified that she recognized the handwriting on the diagram to be petitioner's. (T. 788).

(2)    A piece of paper containing petitioner's name, his brother's name, his brother's telephone numbers, the address for a bar in Astoria that his brother owned, a description of Familia's car and Familia's address, (Lance: T. 597, 600-01, 603-05; Familia: T. 789-90; People's Exhibit 3), which, according to Lance, was written by petitioner for the purpose of assisting the hit man to get paid. (Lance: T. 597, 600-01, 603-05). Familia testified that she recognized the handwriting on that piece of paper to be petitioner's. (T. 789-90).

(3)    A piece of paper containing Familia's social security number and date of birth, (Lance: T. 615-18, 738-39; Familia: T. 795; People's Exhibit 6), which, according to Lance, petitioner wrote and gave to him with instructions that it be given to the intended hit man for the purpose of helping him to track Familia down, (Lance: T. 615-18, 738-39). Familia testified that she recognized the handwriting on that piece of paper to be petitioner's. (T. 795).

(4)    A piece of paper containing a description of petitioner's daughter's car written by Lance as the information was provided to him by petitioner for the purpose of informing the intended hit man where the photograph of Familia would be placed. (T. 619-20, 622-23, 660; People's Exhibit 8).

(5)    A piece of paper on which (a) Lance had written petitioner's daughter's home telephone number in case the intended hit man needed to contact her about the photograph of Familia and (b) petitioner had written the name, telephone numbers and address of his neighbor. (Lance: T. 623-626, 659-660, 714; People's Exhibit 9). Familia testified that she recognized the handwriting of the neighbors' information as being petitioner's. (T. 800-01).

(6)    Pieces of paper containing further information about the three (3) people petitioner wanted killed, including their names, physical descriptions, work and/or home addresses, telephone numbers and license plate numbers, and the make of their cars, which, according to Lance, he wrote as petitioner dictated the information to him, (T. 576-77, 592-97, 602-03, 615-18, 631-32, 710; People's Exhibits 2,10).

(7)    A document containing three (3) telephone numbers for Familia, the name "Henry Lorenzo," which petitioner believed was Ruiz's name, Ruiz's phone number, the name "Johnny Ordino," whom petitioner believed to be Janet's boyfriend, and Janet's telephone number and address, (Lance: T. 605-09; Familia: T. 790-92, 803; People's Exhibit 4), which, according to Lance, was written by petitioner, (Lance: T. 605-09). Familia testified that she recognized the handwriting on the front of that document to be petitioner's. (T. 790-93). On the back of the document, Lance had also transcribed the physical descriptions of Janet and Ruiz and Familia's work address as that information was provided to him by petitioner. (Lance: T. 605-09). According to Lance, petitioner had told him to give that document to the intended hit man with (a) instructions to question Janet before killing her and to kill anyone else who was in the house with her, (T. 609-10), and (b) a suggestion that the intended hit man pose as a detective or somebody from the district attorney's office in order to locate Familia, (T. 610).

Lance testified that he gave every document he ever received from petitioner to Potapchuck within several days after its receipt. (T. 601, 606-07, 615-617, 620-21, 624-626, 632-33, 700, 721-22).

2. Media Exposure

After the first day of trial, defense counsel alerted the trial court to a newspaper article that had been published about the case, (Court Exhibit 5),[3] and requested that the court ask the jurors

---

[3] The article, published in the New York Daily News on November 18, 2004, reads as follows:

WANTED WIFE TO PAY HER KILLER by Scott Shifrel.

AN UNHAPPY hubby wanted his wife to pay for her own murder, Queens prosecutors said yesterday.

Enraged George Gouvatsos, already in jail for splitting his spouse's head open with a hammer, told a cop posing as a hit man to take her to an automated teller machine, make her pay him and then kill her, according to stunning tape recordings played for the jury yesterday.

"She can take the money out from the machine," Gouvatsos, 51, of Whitestone, says on the tape.

"You want her to pay for this? Is that what you're telling me?" Detective James MacDonald asks.

"Yeah," answers Gouvatsos, who allegedly promised the detective $5,000 for the hit.

Gouvatsos is on trial for conspiracy in Queens Supreme Court.

After he was convicted and sentenced to 15 years in prison for the Sept. 30, 2002, hammer assault on his wife, Gouvatsos allegedly told another inmate at Rikers Island that he wanted to have his wife, who recovered, and her boyfriend killed.

The inmate then told authorities, who set up the undercover operation in late 2002 and early 2003 and recorded eight phone calls between Gouvatsos and cops he thought were hit men.

"How do you want me to do it? You still want me to beat them?" MacDonald asks on one.

"No, they gotta disappear," Gouvatsos says.

whether they had seen it. (T. 498-500). Although noting that it had repeatedly instructed the jury not to read any media reports regarding the case, the trial court nonetheless asked the jurors, as a group, if anyone had read the article. (T. 500-503). After two (2) of the jurors indicated that they had seen the article, (T. 503-04), the trial court indicated that it would interview those jurors separately and instructed the rest of the jury "not to . . . . speculate about th[e] media article" because "[they]'re the judge of the facts in th[e] case ... and there is absolutely no way in which anybody else's rendition ... about th[e] case should be something that [they] consider." (T. 503-4).

Upon questioning by the trial court, juror number two ("Juror No. 2") admitted that she had read the entire article despite the trial court's admonitions not to read about the case in the media. (T. 504-5). The following colloquy ensued:

> [Prosecutor]: Anything about reading the article which would impair your ability to be fair and impartial as a juror in this particular case?
>
> [Juror No. 2]: Basically, the article was -- whatever was said here was already in the article, so it didn't really make a difference.
>
> . . .
>
> [Defense Counsel]: You said what was in the article was nothing other than what happened in court yesterday.
>
> [Juror No. 2]: Correct.
>
> [Defense Counsel]: It's your opinion that what you were reading in the article is what went on in the courtroom yesterday?
>
> [Juror No. 2]: To some extent. Like what was verbalized here was, basically, verbalized in the article . . . .
>
> . . .

---

"How do you want it done though? . . . Chop them up? Burn them? What?"

"Whatever you want, I don't care," Gouvatsos says. "Suffer, make them suffer."

THE COURT: When you say you believe what was in the article was to an extent what happened here, are you saying word-for-word it was or just general impression?

[Juror No. 2]: No, just in general. Like some of the things that . . . each of [counsel] said when they did their opening was kind of said in the article, so it really didn't effect anything.

THE COURT: So. . . [y]ou're saying your general impression of the article is what you recall from the openings?

[Juror No. 2]: Yes.

(T. 505-6).

The other juror, juror number eight ("Juror No. 8"), indicated that she had started to read the article without realizing that it was about petitioner's case because his name had been misspelled, but she stopped reading it when she recognized MacDonald's name. (T. 509-513, 518-522). The following colloquy ensued:

THE COURT: Is there any possibility that the portion of the article you did read is going to interfere with your ability [to base your decisions on what you hear from the witnesses and any exhibits that come into evidence]?

[Juror No. 8]: No. Because the article, basically, said the same thing that happened in here yesterday. Some things, to me, they seemed like they were wrong according to – because I was here – according to the article. It seems like what I heard and what I read wasn't, exactly, the same thing.

. . .

[Defense counsel]: Are you saying that there were inaccuracies in [the article], and it was different from what you observed yesterday in court?

[Juror No. 8]: I thought it was a little different, yes.

. . .

[Defense Counsel]: . . .[D]id [the article] influence you to form any opinions about what you heard yesterday in the courtroom.

11

[Juror No. 8]: The only opinion that I formed was that whoever wrote the article, either they didn't hear what I heard, or I didn't hear what they heard.

. . .

THE COURT: . . . Is there any reason you feel biased or prejudiced towards either side because of reading the article?

[Juror No. 8]: No.

THE COURT: Can you understand how there is no third party view of the facts that should in anyway enter into the minds of our jurors?

[Juror No. 8]: Yes.

. . .

[Defense Counsel]: . . . [A]fter reading this article, did you discuss it with anybody else?

[Juror No. 8]: No.

[Defense Counsel]: Did anybody ever discuss anything with you, on the jury panel, about the article?

[Juror No. 8]: No. Matter of fact, I saw some people with the paper this morning in the room, and I didn't discuss it with them. They didn't discuss it with me, so I don't know if anybody else read anything.

(T. 510-513).

Defense counsel then moved to remove Juror No. 2, but not Juror No 8, from the jury panel, (T. 514), arguing:

Although, [Juror No. 2] said she didn't form an opinion, and she can be fair, the fact that she says that what was quoted in the newspaper yesterday was what happened in court yesterday, she is taking what was reported yesterday as fact, from the newspaper. They have quotes in there. They have conclusions in there that only they can draw after the entire case is over, and because of that fact, I think, she has been tainted at this point. I ask that she be removed.

. . .

[Juror No. 8] has indicated that after reading [the article] she's realized that it is different than what happened in court yesterday, so she seems to be able to make that distinction, so she recognizes that, and I have no problem leaving her on.

. . .

12

Judge, [Juror No. 2's] response that what was quoted in the newspaper yesterday was similar to what happened in court leads me to believe that she is taking what was reported and using it to determine, yes, that's what happened in court yesterday when, in fact, it's not. If your Honor reads the article . . . they come to conclusions in the article, . . . [for example,] where it talks about him insisting that the wife pay for the hit man before he murders her. That was insinuated yesterday, but they're publishing it in the newspaper as if that's, exactly, what was stated, and that it was fact, and it's not fact. The fact that she is not distinguishing that troubles me . . . .

. . .

. . . [Juror No. 2] did say after reading the entire article that it didn't change her opinion because it was what happened in court yesterday, so that leads me to believe she was taking it as fact. . . . [S]he's already been tainted by reading the article and thinking that's what happened yesterday.

(T. 514-18).

Following defense counsel's argument, Juror No. 2 was re-questioned as follows:

THE COURT: This newspaper article that you read, . . ., when you read it did you accept it as being the facts of our case?

[Juror No. 2]: No, not the facts. Just, basically, I already knew . . . somewhat of what was said . . . throughout the days that I have been here, so when I read I said, 'Oh, I already know that,' and then I just pushed it away.

THE COURT: . . .[W]hat I want to understand is, in your mind have you, now, blurred what you read in the article with what's happened in court? Is there anything you accepted, . . . .

[Juror no. 2]: Right. I'm not saying that I believe necessarily, like I have made a decision based on like the article, but reading it, like some of the things in there were already said here. That's what I'm trying to say. I haven't made like a decision based upon what I read. I haven't like formulated, oh, based on this article, so and so.

THE COURT: . . . [I]s there anyway that you have adopted anything in that article as being something that you have evaluated as what's happened in this case? Have you blurred what you read in the article with what you heard from the stand, or the attorney mentioned that you were comparing it to the openings, or you thought it was familiar from the openings. . . . [H]ave you adopted anything in the article as part of this case in your mind?

[Juror No. 2]: No, not to influence me in anyway. No.

. . .

13

[Defense counsel]: . . . [Y]ou said earlier that what you read in the article was what you heard in this courtroom yesterday, right?

[Juror No. 2]: Right. Well, it was familiar.

[Defense counsel]: . . . [D]o you mean that when you were reading the article you knew those to be the facts because you heard it in court yesterday?

[Juror No. 2]: Not the facts. I don't want to say the facts. It just sounded familiar. . . . [R]eading the article, I didn't say, okay. This is exactly what happened, . . . based on what was said by the prosecution and [defense counsel]. It just was familiar. There were similarities, and that's, basically, it.

[Defense Counsel]: Did you find any dissimilarities in the article compared to what happened yesterday in court?

[Juror No. 2]: Some.

[Defense counsel]: Can you recall what those dissimilarities were?

[Juror No. 2]: There was something in the article discussed about money which wasn't discussed here so–

. . .

THE COURT: Did you discuss this with any of your fellow jurors this morning?

[Juror No. 2]: No.

(T. 518-521).

Following the re-questioning of Juror No. 2, defense counsel again argued for her removal as follows:

". . . [Juror No. 8], one, made it clear from the beginning that she didn't take it as fact as to what happened because it was different than what she recalls happening in court yesterday. She distinguished that from the very beginning. She, also, said that she stopped when she realized there was an article regarding this case, which means she was able to follow the Court's instructions.

[Juror No. 2] not only stated that it didn't effect her opinion because it was the same thing she heard in court the day before, but she did not follow the Court's instructions to stop. She read completely through the article.

So based on those two . . . factors, Judge, I ask that juror number two . . . be removed because she is tainted, and it's prejudicial to my client to keep her on the jury at this point.

14

(T. 522-23).

The trial court granted petitioner's motion to remove Juror No. 2, finding that "there seem[ed] to be strategic reasons . . . for the defense to want to keep [Juror No. 8] and not [Juror No. 2], since the additional questioning totally removed the basis for what [defense counsel] [was] arguing as how they viewed the article," but that there was "a distinguishing feature as to how [the two jurors] dealt with the article [since] [Juror] number eight did say she stopped [reading], and [Juror] number two said that she continued." (T. 525-26). The trial court continued: "Since [Juror] number two continued [reading] the article after she knew it involved the case despite the Court's [instruction], the Court is going to grant defense's [sic] request to remove [Juror] number two." (T. 527).

### 3. Verdict and Sentence

The jury (a) found petitioner guilty of two (2) counts of conspiracy in the second degree (N.Y. Penal Law § 105.15) and three (3) counts of criminal solicitation in the second degree, (N.Y. Penal Law § 100.10), and (b) not guilty of one (1) count of conspiracy in the second degree, (T. 1043-46), relating to the alleged conspiracy to kill Janet. (T. 819). On December 21, 2004, petitioner was sentenced to concurrent indeterminate terms of imprisonment of ten (10) to twenty (20) years on one (1) count of conspiracy in the second degree, six (6) to twelve (12) years on the other count of conspiracy in the second degree and three (3) to six (6) years on each of the criminal solicitation counts.

15

B.    Procedural History

Petitioner appealed his judgment of conviction to the Appellate Division on the grounds:

(1) that he was denied the effective assistance of counsel by reason of his attorney's failure (a) to

request a mistrial or to seek "other remedies, including the polling of the jurors," after it was

discovered that two (2) jurors had read a news article about his case, and (b) to request a second

psychiatric examination of him pursuant to Article 730 of the New York Criminal Procedure Law

in order to determine his fitness to stand trial ("Article 730 examination"); (2) that the evidence

was legally insufficient to establish his guilt beyond a reasonable doubt and that Lance's testimony

was incredible as a matter of law; and (3) that the sentence imposed was harsh and excessive.

On November 20, 2007, the Appellate Division affirmed the judgment of conviction,

finding, *inter alia*: (1) that petitioner's contention that Lance's testimony was incredible as a matter

of law was unpreserved for appellate review pursuant to Section 470.05(2) of the New York

Criminal Procedure Law and, in any event, was without merit; (2) that the evidence was legally

sufficient to establish petitioner's guilt beyond a reasonable doubt and the verdict was not against

the weight of the evidence; (3) that petitioner received the effective assistance of counsel; and (4)

that the sentence imposed was not excessive. People v. Gouvatsos, 45 A.D.3d 779, 844 N.Y.S.2d

900 (2d Dep't 2007).  On February 8, 2008, the New York State Court of Appeals denied

petitioner's application for leave to appeal to that court from the November 20, 2007 order of the

Appellate Division. People v. Gouvatsos, 10 N.Y.3d 765, 854 N.Y.S.2d 327, 883 N.E.2d 1262

(2008).

On April 3, 2009, petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court, on the grounds: (1) that he was denied the effective assistance of counsel by his trial counsel's failure (a) to request a mistrial or have the jury polled after two (2) jurors admitted to reading a news article about the case, and to seek removal of Juror No. 8 from the panel, and (b) to request a second Article 730 examination of him; and (2) that the state court's determination that the evidence was legally sufficient to establish his guilt beyond a reasonable doubt was unreasonable.

## II.   Discussion

### A.   Standard of Review

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus:

> "[S]hall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

A state court determination is "contrary to * * * clearly established Federal law," 28 U.S.C. § 2254(d), "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court

has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13, 120

S. Ct. 1495, 164 L.Ed.2d (2000); see also Lafler v. Cooper, — U.S. —, 132 S.Ct. 1376, 1390, 182

L. Ed. 2d 398 (2012) ("A decision is contrary to clearly established law if the state court applies a

rule that contradicts the governing law set forth in Supreme Court cases." (alterations, quotations

and citation omitted)). Alternatively, under the "unreasonable application" standard of Section

2254(d), "a federal habeas court may grant the writ if the state court identifies the correct

governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413, 120 S. Ct. 1495. A state

court's "unreasonable application" of law must have been more than "incorrect or erroneous;" it

must have been "objectively unreasonable." Sellan, 261 F.3d at 315 (quotations and citation

omitted); see also Grayton v. Ercole, — F.3d. —, 2012 WL 3329715, at * 7 (2d Cir. Aug. 15,

2012) (holding that a writ of habeas corpus "may only issue [under the 'unreasonable application'

standard] where the state court's application of the law was not only wrong, but unreasonable.")

Claims that were not adjudicated on the merits in state court are not subject to the

deferential standard that applies under AEDPA. See Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769,

1784, 173 L.Ed.2d 701 (2009) (citing 28 U.S.C. § 2254(d)). But where AEDPA's deferential

standard of review does apply, the "state court's determination of a factual issue is presumed to be

correct, and may only be rebutted by clear and convincing evidence." Bierenbaum v. Graham, 607

F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)), cert. denied, 131 S. Ct. 1693, 179 L.

Ed. 2d 645 (2011); see also Schriro v. Landrigan, 550 U.S. 465, 473-74, 127 S. Ct. 1933, 167 L.

Ed. 2d 836 (2007). Under AEDPA's deferential standard of review, "[f]ederal courts sitting in

habeas are not an alternative forum for trying facts and issues which a petitioner made insufficient

effort to pursue in state proceedings.'" Cullen v. Pinholster, --- U.S. ----, 131 S.Ct. 1388, 1401, 179 L.Ed.2d 557 (2011), reh'g denied, 131 S. Ct. 2951, 180 L. Ed. 2d 239 (2011) (quoting Williams, 529 U.S. at 437, 120 S.Ct. 1479).

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law." Swarthout v. Cooke, --- U.S. ----, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011), reh'g denied, 131 S. Ct. 1845, 179 L. Ed. 2d 796 (U.S. 2011).


B.      Ineffective Assistance of Counsel

The Appellate Division's determination that petitioner received the effective assistance of counsel, Gouvatsos, 45 A.D.3d 779, 844 N.Y.S.2d 900, is an adjudication on the merits entitled to AEDPA's deferential standard of review. See Hawthorne v. Schneiderman, — F.3d —, 2012 WL 3553364, at * 3 (2d Cir. Aug. 20, 2012) ("A summary disposition constitutes a disposition 'on the merits[,]" entitled to deference under the AEDPA). "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing that there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. ----, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011); see also Watson v. Green, 640 F.3d 501, 511 (2d Cir. 2011), cert. denied, 132 S. Ct. 335, 181 L. Ed. 2d 209 (2011). The Supreme Court has held that:

> "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication of state-law procedural principles to the

contrary. * * * § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"

Harrington, 131 S.Ct. at 784–785. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or * * * could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id; see also Hawthorne, — F.3d —, 2012 WL 3553364, at * 3.

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must prove both: (1) that counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms;" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Padilla v. Kentucky, — U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). On habeas review of an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, 131 S.Ct. at 785; see also Santone v. Fischer, — F.3d —, 2012 WL 3326419, at * 15 (2d Cir. Aug. 7, 2012).

The AEDPA requires federal courts to give state courts "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review. Harrington, 131 S.Ct. at 786. Review of a state court's rejection of an ineffective assistance of counsel claim is "doubly

deferential," <u>Knowles v. Mirzavance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009), i.e., the court must "take a 'highly deferential' look at counsel's performance [pursuant to] <u>Strickland</u>, <u>supra</u>, at 689, 104 S. Ct. 2052, through the 'deferential lens of § 2254(d),' [<u>Knowles</u>], <u>supra</u>, at ——, n. 2, 129 S.Ct. at 1419, n. 2." <u>Cullen v. Pinholster</u>, —— U.S. ——, 131 S.Ct. at 1403. Thus, in order to prevail on his ineffective assistance of counsel claim, petitioner must demonstrate that it was "necessarily unreasonable" for the state court to conclude: "(1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the [jury's verdict and his sentence]." <u>Cullen</u>, 131 S.Ct. at 1403.

A petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." <u>Knowles</u>, 556 U.S. 111, 129 S.Ct. at 1420; <u>see also</u> <u>Harrington</u>, 131 S. Ct. at 787. This presumption may only be rebutted by demonstrating that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 690, 104 S.Ct. 2052; <u>see also</u> <u>Cornell v. Kirkpatrick</u>, 665 F.3d 369, 377 (2d Cir. 2011) (holding that errors by counsel which violate the Sixth Amendment "include omissions that cannot be explained convincingly as resulting from a sound trial strategy but instead arose from oversight, carelessness, ineptitude, or laziness." (quotations and citations omitted)); <u>Greiner v. Wells</u>, 417 F.3d 305, 326 (2d Cir 2005) ("Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude * * * <u>Strickland</u>'s strong presumption [of effective assistance of counsel] must stand." (quotations and citation omitted)). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. 2052; <u>see also</u> <u>Brown v. Greene</u>, 577 F.3d 107, 110 (2d Cir.2009), and the court should review the circumstances "from counsel's perspective at the time" of the trial. <u>Strickland</u>, 466 U.S. at 689;

see also Murden v. Artuz, 497 F.3d 178, 198 (2d Cir.2007). "[St]rategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in habeas corpus proceedings. Knowles, 129 S.Ct. at 1420, 1421 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

Petitioner has not established that the Appellate Division's determination that he received the effective assistance of counsel during his trial was unreasonable. Defense counsel, *inter alia*, delivered reasonable and cogent opening and closing arguments; effectively cross-examined witnesses; interposed timely and reasonable objections during trial; argued vigorously for a dismissal of the charges; requested appropriate jury charges; and was successful in having one (1) juror who read a news article about the case removed from the panel, in moving to preclude a detailed cross-examination of petitioner, should he testify at the trial, about all of the facts underlying his prior assault convictions, (T. 30-35, 45-51), in seeking to suppress evidence of a September 10, 2002 indictment, (T. 45, 48), in having certain counts of the indictment charged in the alternative, (T. 889-90, 897-98), and in obtaining an acquittal on one (1) of the charges against petitioner. See Harrington, 131 S. Ct. at 791 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."); United States v. DiPaolo, 804 F.2d 225, 234–35 (2d Cir.1986) (holding that defendants were not denied effective assistance of counsel where counsel appeared well prepared and had good understanding of the facts and legal principles involved in case); Wise v. Smith, 735 F.2d 735, 738 (2d Cir. 1984) (finding that the petitioner was not denied the effective assistance of counsel where his defense counsel was aggressive, well-prepared and had a good grasp of the facts and an adequate understanding of the legal principles involved, and no crucial element of defense was omitted). As set forth below, petitioner has not pointed to any defect in his trial counsel's representation that fell

below an objective standard of reasonableness under prevailing professional norms existing at the time of his trial and which rendered his overall performance constitutionally deficient.

### 1. Juror Bias

Petitioner's claim that his trial counsel was ineffective for failing to move to discharge both of the jurors who read a news article about the case, rather than only one, or for a mistrial based upon juror bias or misconduct, is without merit.

Although "[t]he Sixth Amendment secures to criminal defendants the right to trial by an impartial jury," Skilling v. United States, 130 S.Ct 2896, 2912-13, 177 L. Ed. 2d 619 (2010), "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 946, 71 L. Ed. 2d 78 (1982); see also Skilling, 130 S.Ct at 2915 ("A presumption of prejudice [from juror exposure to news accounts of the crime] . . . attends only the extreme case."); U.S. v. Schwartz, 283 F.3d 76, 99 (2d Cir. 2002) ("[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not.") "[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith, 455 U.S. at 217, 102 S. Ct. 940. "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id.

Upon learning of the news article at issue, defense counsel properly requested that the trial court question the jury about whether any of them had read it. The court then polled the jurors, as a group, to ascertain if any of them had read the article. After two (2) jurors admitted to having read at least part of the article, the court instructed the other jurors to refrain from speculating, then

the court and counsel questioned the two (2) jurors individually and extensively, outside the presence of the other jurors, to determine what effect, if any, the article had on their ability to decide the case fairly. Due process requires no more. See e.g. U.S. v. Elfgeeh, 515 F.3d 100, 129 (2d Cir. 2008); United States v. McDonough, 56 F.3d 381, 386 (2d Cir. 1995); United States v. Scopo, 861 F.2d 339, 349 (2d Cir. 1988); United States. v. Gaggi, 811 F.2d 47, 51 (2d Cir. 1987).

Based on the answers given by the two (2) jurors who read the article, the trial court remained assured of the impartiality of both of them but nonetheless granted defense counsel's motion to discharge Juror No. 2, indicating its belief that there was "a strategic reason for the defense to want to keep [one juror] but not [the other]." Based upon the record, neither the trial court's nor defense counsel's determination that Juror No. 8 remained impartial was unreasonable, see Vellon v. David, 01-CV-6505(JBW), 2003 WL 23185761, at * 9-10 (E.D.N.Y. Nov. 11, 2003) (holding that a juror need not be discharged where the trial court "remain[s] assured of the jury's impartiality" after "question[ing] each juror individually as to whether he or she had been exposed to [a news] article [about the case] and whether . . . the article affected the juror's ability to remain fair and impartial."), and defense counsel's strategic decision not to move for the dismissal of Juror No. 8, who assured the trial court and counsel that she was impartial, would decide the case only upon the evidence presented and had not prejudged the case, was not "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Likewise, defense counsel's decision not to move for a mistrial did not render his assistance ineffective. Since the trial court properly polled the entire jury panel; individually questioned the two (2) jurors who indicated that they had read the article; dismissed the one (1) juror whose

continued impartiality was questioned by defense counsel; and determined that the other juror

remained impartial and able to follow the court's instructions, and that defense counsel had a

strategic reason for keeping one juror and not the other, any motion for a mistrial would likely have

been unsuccessful. See e.g. Vellon, 01-CV-6505(JBW), 2003 WL 23185761; People v. Genovese,

10 N.Y.2d 478, 482-83, 180 N.E.2d 419 (1962). Counsel cannot be said to have been deficient for

failing to assert a "claim that stood almost no chance of success." Knowles, 556 U.S. at 123, 129

S. Ct. 1411.

### 2. Article 730 Examination

In support of his claim that his trial counsel was ineffective for failing to seek a second

Article 730 examination of him, petitioner points to his outbursts during the People's opening

statement, summations and Lance's testimony, (T. 422-26, 585, 947-53), as well as his

disagreements with his counsel on certain issues, (T. 174-83, 347-49, 353-67, 382, 387, 397, 403-

04, 409-12).

"The constitutional right to due process is violated when a person who is incompetent is

convicted of a crime." Harris v. Kuhlmann, 346 F.3d 330 (2d Cir. 2003); see also Indiana v.

Edwards, 554 U.S. 164, 170, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008) ("[T]he Constitution does

not permit trial of an individual who lacks 'mental competency.'"); Medina v. California, 505 U.S.

437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992) ("The criminal trial of an incompetent violates

due process.") "Due process requires that 'a person whose mental condition is such that he lacks

the capacity to understand the nature and object of the proceedings against him, to consult with

counsel, and to assist in preparing his defense may not be subjected to trial.'" United States v.

Arenburg, 605 F.3d 164 (2d Cir. 2010) (quoting Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct.

896, 43 L.Ed.2d 103 (1975)). "A defendant may not be put on trial unless he has sufficient present ability to consult with his lawyers with a reasonable degree of understanding and a rational as well as factual understanding of the proceedings against him." Harris, 346 F.3d at 349-50 (quoting Cooper v. Oklahoma, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)); see also Edwards, 554 U.S. at 170, 128 S. Ct. 2379. However, "some degree of mental illness cannot be equated with incompetence to stand trial." United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986); see also United States v. Nichols, 56 F.3d 403, 412 (2d Cir. 1995).

"'[T]he right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination.'" Harris, 346 F.3d at 350 (quoting Cooper, 517 U.S. at 354 n. 4 (citation omitted)). "'[A] trial court *must always be alert* to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial,'" Arenburg, 605 F.3d at 168-69 (quoting Drope, 420 U.S. at 171, 95 S. Ct. 896) (emphasis in original), and must hold a competency hearing whenever "there is reasonable ground . . . to conclude that the defendant may not be competent to stand trial." Harris, 346 F.3d at 350 (quotation and citation omitted). There are "'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.'" Id. (quoting Drope, 420 U.S. at 180, 95 S. Ct. 896). "In the end, then, the inquiry is whether, in light of what was then known to the trial court, the failure to make further inquiry into [the defendant's] competence to stand trial denied him a fair trial." Id. (quotations, alterations and citations omitted).

Prior to the start of trial, an Article 730 examination was conducted of petitioner and he was found fit to stand trial. (Petitioner's brief to the Appellate Division at 29). None of the

behavior petitioner engaged in during the trial comes close to establishing that he could not rationally consult with his lawyer nor understand the proceedings against him. In fact, the trial court noted that petitioner and his attorney "worked very well together [,] conferred with one another [and] looked at notes together" during jury selection. (T. 362). With respect to the disagreements between petitioner and his counsel, the trial court indicated: (1) that petitioner seemed to have a problem with attorneys in general, as he had already had three (3) attorneys represent him, (T. 390); (2) that petitioner's efforts to have his attorney relieved as his counsel were merely "dilatory," (T. 354, 360–61, 387, 390, 394-97); and (3) that petitioner "advocated very strenuously on [his] own behalf," (T. 404), and had "the capacity to" write different letters to the court, (T. 404), but did not appear to "want [his] trial to go forward," (T. 396). Mere "disagreement with one's attorney does not make one mentally unable to consult with him." United States v. Ghane, 593 F.3d 775, 781 (8th Cir. 2010); see also United States v. Caicedo, 937 F.2d 1227, 1231 (7th Cir. 1991) ("[D]isagreements between a defendant and his counsel hardly establish an inability to assist counsel or to understand the nature of the proceedings.") Similarly, petitioner's occasional outbursts during trial were insufficient to give the trial court or defense counsel reasonable cause to believe that petitioner may not have been competent to stand trial. Since petitioner's behavior at trial provided no basis to question his competency to stand trial, defense counsel was not ineffective for failing to seek a second Article 730 examination of petitioner.[4]

---

[4] In light of the determination that trial counsel's performance was reasonable, it is unnecessary to consider Strickland's prejudice prong. See Strickland, 466 U.S. at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to . . . even address both components of the inquiry if the defendant makes an insufficient showing in one."); Torres v. Donnelly, 554 F.3d 322, 327 (2d Cir. 2009) (declining to address the reasonableness of counsel's performance where the petitioner had failed to demonstrate prejudice under the second

As petitioner has not demonstrated that the Appellate Division's denial of his ineffective assistance of counsel claim was contrary to, or an unreasonable application of, <u>Strickland</u>, or was based on an unreasonable determination of the facts in light of the evidence presented at trial, <u>see</u> 28 U.S.C. § 2254(d), his ineffective assistance of trial counsel claim is denied.

### C.     Legal Insufficiency Claim

#### 1.     Credibility of Lance's Testimony

Petitioner's argument that Lance's testimony is incredible as a matter of law is procedurally defaulted.

A claim is procedurally defaulted "when (1) a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." <u>Walker v. Martin</u>, ---U.S. ----, 131 S.Ct. 1120, 1127, 179 L.Ed.2d 62 (2011) (alteration in original, quotation marks and citation omitted); <u>see also</u> <u>Martinez v. Ryan</u>, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012); <u>Maples v. Thomas</u>, 132 S. Ct. 912, 922, 181 L. Ed. 2d 807 (2012). In order for a claim to be procedurally defaulted, the state court's reliance on a state procedural rule must be unambiguous and "clear from the face of the opinion." <u>Fama v. Comm'r of Corr. Svcs.</u>, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted); <u>see also</u> <u>Messiah v. Duncan</u>, 435 F.3d 186, 195 (2d Cir. 2006); <u>Galarza v. Keane</u>, 252 F.3d 630, 637 (2d Cir. 2001). If a state court holding contains a plain statement that a claim is procedurally defaulted, then the federal court may not review it, even if the state court also rejected the claim on the merits. <u>See</u> <u>Harris v. Reed</u>, 489 U.S.

prong of <u>Strickland</u>).

255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] state court need not fear reaching

the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state

procedural rule as a separate basis for its decision); see also Murden, 497 F.3d at 191 ("Even where

the state court has ruled on the merits of a federal claim 'in the alternative,' federal habeas review

is foreclosed where the state court has also expressly relied on the petitioner's procedural default.")

Federal habeas review of a procedurally defaulted claim is only available if the petitioner

establishes cause for his procedural default in state court and actual prejudice resulting from the

alleged violations of federal law, or that a failure to consider the claims will result in a

"fundamental miscarriage of justice," i.e., that he is actually innocent of the crime for which he was

convicted. Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991);

see also Edwards v. Carpenter, 529 U.S. 446, 451, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000).

"Cause for a procedural default exists where something external to the petitioner, something that

cannot fairly be attributed to him, . . . impeded his efforts to comply with the State procedural

rule." Maples, 132 S. Ct. at 922 (alterations, quotations and citation omitted).

    The Appellate Division rejected petitioner's legal insufficiency claim based upon Lance's

testimony as unpreserved for appellate review pursuant to Section 470.05(2) of the New York

Criminal Procedure Law § 470.05. Gouvatsos, 45 A.D.3d 779, 844 N.Y.S.2d 900. Petitioner's

contention that his counsel in fact preserved that claim is unsupported by the record. (T. 818-821,

836-38).

    New York's "contemporaneous objection" rule, codified at Section 470.05(2) of the New

York Criminal Procedure Law, has been held to be an independent and adequate state procedural

rule which precludes habeas review of a procedurally defaulted claim absent exceptional

circumstances not present here. See, e.g. Downs v. Lape, 657 F.3d 97, 103-8 (2d Cir. 2011), cert.

denied 132 S. Ct. 2439, 182 L. Ed. 2d 1070 (2012); Whitley v. Ercole, 642 F.3d 278, 280 (2d Cir. 2011), cert. denied 132 S. Ct. 791, 181 L.Ed.2d 489 (2011). Since the Appellate Division invoked an independent and adequate state procedural rule as a basis for its rejection of petitioner's legal insufficiency claim based upon the credibility of Lance's testimony, and petitioner has not established cause for his default of that claim and actual prejudice, or that it would be a fundamental miscarriage of justice if the claim were not reviewed by this Court, federal habeas review of that claim is precluded. Accordingly, petitioner's legal insufficiency claim based upon the credibility of Lance's testimony is dismissed as procedurally defaulted.

### 2. Sufficiency of the Evidence

Petitioner's contention that the Appellate Division's determination that the evidence was legally sufficient to establish his guilt beyond a reasonable doubt was unreasonable is without merit.

When considering the legal sufficiency of the evidence, the federal habeas court "must look to state law for the substantive elements of the criminal offense," Coleman v. Johnson, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d 978 (2012), reh'g denied, 2012 WL 2974698 (July 23, 2012) (quotations and citation omitted); see also Henry v. Ricks, 578 F.3d 134, 137-38 (2d Cir. 2009), and determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); see also Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Coleman, 132 S.Ct at 2065 ("[T]he only question under Jackson is whether th[e] [jury's] finding [of guilt] was so insupportable as to fall below the threshold of bare rationality.") "[A] reviewing court 'faced with

a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Cavazos v. Smith, ——U.S. ——, 132 S.Ct. 2, 6, 181 L.Ed.2d 311 (2011), reh'g denied, 132 S. Ct. 1077, 181 L. Ed. 2d 794 (2012) (quoting Jackson, 443 U.S. at 326, 99 S.Ct. 2781).

"[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." Parker, 132 S.Ct. at 2152 (quotations and citation omitted); see also Coleman, 132 S.Ct. at 2062; Santone, — F.3d —, 2012 WL 3326419. Thus, "sufficiency challenges to state-court convictions [are reviewed] under a doubly deferential standard of review . . . [The Court] defer[s] first to the jury's verdict, drawing all inferences in its favor . . . Second, [the Court] defer[s] to the state courts' rejection of the defendant's constitutional arguments, at least insofar as it did not result from an unreasonable determination of the facts or an unreasonable application of clearly established federal law." Epps v. Poole, —— F.3d ——, 2012 WL 2345382, at * 3 (2d Cir. June 21, 2012) (holding that the question on federal habeas review of a legal insufficiency claim is whether the state court's application of Jackson was objectively unreasonable.); see also Garbutt v. Conway, 668 F.3d 79, 81 (2d Cir. 2012). A writ of habeas corpus may not be granted on a sufficiency of the evidence claim "unless [the habeas court] conclude[s] that *no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." Garbutt, 668 F.3d at 82 (emphasis in original).

Under New York law at the time of the offenses for which petitioner was convicted: (1) a person was guilty of criminal solicitation in the second degree if "with intent that another person engage in conduct constituting a class A felony, he solicits, requests, commands, importunes or

otherwise attempts to cause such other person to engage in such conduct," (N.Y. Penal Law § 100.10); and (2) a person was guilty of conspiracy in the second degree if "with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." (N.Y. Penal Law § 105.15). There is sufficient evidence in the record from which a rational juror could have found the essential elements of those offenses beyond a reasonable doubt. Specifically, the evidence against petitioner at trial included, *inter alia*: Familia's testimony that at all relevant times, she was a witness in a criminal proceeding pending against petitioner arising from his attack of her; Lance's testimony that petitioner asked him to arrange the murders of Familia, Janet, and Ruiz; MacDonald's testimony that petitioner, believing him to be a hit man, discussed with him details about how the murders should be carried out, how payment would be made, and how the would-be victims could be found; recordings of conversations Lance and MacDonald had with petitioner which corroborated their testimony; various materials on which petitioner had written information to be given to the intended hit man for use in locating the intended victims and in getting paid for the murders; and Familia's testimony corroborating Lance's and MacDonald's testimony that the handwriting on the various materials and one (1) of the voices on the recordings were petitioner's. Accordingly, the Appellate Division's determination that, upon "[v]iewing the evidence in the light most favorable to the prosecution, * * * [the evidence] was legally sufficient to establish the [petitioner's] guilt beyond a reasonable doubt," Gouvatsos, 45 A.D.3d 779, 844 N.Y.S.2d 900, is not "contrary to or an unreasonable application of clearly established federal law," nor is it based upon an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Therefore, petitioner's legal insufficiency claim is denied.

32

III.    Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is denied and the proceeding is dismissed in its entirety. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253. The Clerk of the Court shall enter judgment in favor of respondent, close this case, and serve notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to petitioner at his last known address. See Fed. R. Civ. P. 5(b)(2)(c).

SO ORDERED.

s/ Sandra J. Feuerstein

_____
Sandra J. Feuerstein
United States District Judge

Dated: August 23, 2012